†CINCINNATI (CITY) v. TRUSTEES CINCINNATI SOUTHERN RY. ET AL.

1. PROVISION IN LEASE FOR SUBMISSION OF DIFFERENCES TO ARBITRATION IS VALID.

The arbitration clause contained in the lease of the Cincinnati Southern Railway made by the Trustees, under and by which it is provided that all questions of difference arising between the parties thereto shall be submitted to arbitration, is valid and binding, not only upon the parties thereto, but upon the City of Cincinnati, the real owner of the demised property, such provision being one that is incorporated into nearly all leases of railroads, and this lease in all of its terms having been duly approved by the agents of such city, specially authoriz d, and which as a whole has been acted upon by the City for nearly ten years.

2. OFFICES OF TRUSTEES CONTINUED AFTER MAKING LEASE.

The office, powers and duties of the Trustees of the Cincinnati Southern Railway did not cease with the making of said lease, but still continued.

3. CLAUSE INCLUDES DISPUTES AS TO TERMINAL FACILITIES, BUT NOT DAMAGES FOR MISREPRESENTING CONDITION OF ROAD.

The claim of the lessee company arising out of the alleged breach by the Trustees and the City of the provisions of the lease for the expenditure of certain money in the purchase of terminal facilities for the railway so leased, and upon which said company has demanded an arbitration, is fairly covered by the arbitration clause in the lease, but not the other demand made by said lessee company for a submission to arbitration of its claim for damages sustained, losses incurred, and expenditures made by it by reason of the false and fraudulent representations made, as it is claimed, by the Trustees and by the City before the lease was executed, as to the condition of said railway.

4. INJUNCTION WILL NOT BE GRANTED TO PREVENT ARBITRATION BECAUSE PART WILL BE ILLEGAL.

One of the questions to be submitted to arbitration being proper, the fact that the demand also seeks arbitration as to one which does not come within the contract of submission does not afford good ground for a court of equity, in an action for injunction brought for that purpose, to enjoin any arbitration under such demand.

5. NOR AGAINST THE ARBITRATION OF THE IMPROPER QUESTION—AWARD WOULD BE VOID.

Nor should the court interfere by like proceedings to restrain the arbitration of such improper question. Should the arbitrators proceed to adjudicate matters not covered by the agreement of submission, an award on the merits thereof would be void. and, on petition therefor, would be so declared, and set aside by the court.

Error to the Court of Common Pleas of Hamilton county.

SMITH, J.

The petition in this case was filed by the plaintiff through its solicitor, Mr. Horstman, under the provisions of sec. 1777, Rev. Stat., and by the authority of the common council, setting out certain facts claimed to exist, and on which he

---

†This judgment was affirmed by the supreme court, on the grounds stated in this opinion, 52 O. S., 637.

prays the court to enjoin the Cincinnati, New Orleans and Texas Pacific Railway Company and the trustees of the Cincinnati Southern Railway from appointing arbitrators, and from all proceedings looking to an arbitration of certain questions on which an arbitration has been demanded by said railway company under the provisions of clause 14 of the lease made to it of the Cincinnati Southern Railway by the trustees thereof, which lease was dated October 18, 1881. On the filing of this petition in the court of common pleas of this county a temporary injunction was allowed, but this injunction was afterward dissolved, and from the interlocutory order dissolving the same the plaintiff appealed to the circuit court. In this court a further temporary restraining order was allowed, and the question whether the court of common pleas properly dissolved the injunction, or whether it should now be continued, has been submitted to us on the allegations of the original petition, and of an amendment thereto filed before the case came into the circuit court.

There is no controversy as to the facts, no answer having been filed, and the question submitted to us is, whether, on the allegations of the petition, the plaintiff is entitled to the relief sought. We state the conclusions at which we have arrived as briefly as we can, in view of the great importance to the parties and the public of some questions involved in the litigation.

1. In the first place, we are of the opinion that the arbitration clause of the lease in controversy is valid and binding not only upon the parties thereto, but upon the city of Cincinnati, the real owner of the demised property.

By the act of March 18, 1881 (S. & B. Rev. Stat., 8336-7), the said trustees were expressly authorized and required, whenever the line of railway was completed by them so as to admit of the passage of cars from one terminus to another, to lease or sell the same to such persons or company as would conform to the terms and conditions which should be fixed and provided by the trustees of said railway and the trustees of the sinking fund of said city. And it was further provided thereby, that no award of a lease or sale should be made, or possession delivered thereunder, until approved by said trustees of said sinking fund. Under the provisions of this statute, the lease in question was made, and was in all of its terms approved by the trustees of the sinking fund, who, for this purpose, were the agents of, and it thus became the act of the city itself, and is as binding upon it as' if by a valid ordinance the common council, the legislative authority of the city, had authorized, ratified, and confirmed it; for if the general assembly, whose authority as to such matters is supreme, has enacted that the consent of the city shall be given in a certain way, or by certain agencies, when the law is complied with, surely this must be held sufficient, unless something has been done which the law does not allow.

We are not aware that there is any principle of law which forbids a city to submit matters of difference with others to arbitration, and this is what has been done here, by a stipulation, the like of which, as we understand, is incorporated into nearly all leases of railroads. But if there were doubt as to the proposition that the city had expressly, by its agents, consented to this stipulation (and we think there is none), it would seem that, having for ten years accepted the whole lease as binding, by acting upon it without objection, and by receiving from the lessees the immense rental reserved to it thereby, it is now too late to claim that this arbitration clause is not valid as having been made without authority and without its consent. It should, on this state of fact, be held estopped from doing so.

2. The claim is further made on the part of the plaintiff that even if this clause of the lease is valid and binding, that no proper notice of this demand by the lessees for arbitration has been made, though it is conceded to have been done in conformity with the clause itself, and the reason assigned therefor is this: That under the statutes authorizing the appointment of the trustees of the Cincinnati Southern Railway, and the building of a railway, and the performance by them of other duties, among which were the power to sell or lease the same when completed, that on such sale or lease the power and duties of such trustees absolutely ceased and determined; that this lease was made in 1881, and that ever since that' time there have been no trustees of the Cincinnati Southern Railway, their agency or trust having terminated by operation of law, and that the demand made upon

them for arbitration and the call upon them to select arbitrators, were for this reason entirely nugatory, as such demand should have been made upon the city, the real owner of the property and the real party in interest.

This claim so made, we think, is not well founded. There is no express statement in any of the different statutes passed by the legislature of this state, upon this subject-matter, that the trust conferred upon this board by such laws should cease and terminate upon the sale or lease of the road, or at any other fixed or uncertain time. Counsel for the plaintiff have argued to us that, in respect to the continuance of such trust, the trustees of the Cincinnati Southern Railway stand in the same position as did the commissioners appointed under certain statutes to erect a court-house and armory for the county of Hamilton. But a reference to the acts under which these buildings were erected (81 O. L., 362, sec. 14, and 84 O. L., 285, sec. 15) will show that it was clearly and expressly stated, as to the court-house commissioners, that on "the completion of the work and the payment of all liabilities, the term of office of said trustees shall cease," and as to the trustees to build an armory, it was provided that they were to have "the possession and control of any lands acquired by the county as an armory site, to be held by them until the completion of said armory building, when they shall surrender the same to the said county commissioners." But aside from this, it seems to us that an enterprise like that authorized and built under the statutes we are considering, being a railroad several hundred miles in length, costing millions of dollars, and which, under some arrangement may probably remain the property of the city for all time to come, stands on a very different footing in many respects from the mere erection of a court-house or an armory. By the statutes of the three states of Ohio, Kentucky and Tennessee, in each of which this railway is situate, the right is conferred upon this board of trustees to exercise the right of eminent domain therein and to acquire or appropriate any land "or any rights or franchises" necessary for any purpose. See sec. 8313, Rev. Stat., and which we understand to have also been confirmed by enactments in the other states named. It is a matter of general knowledge and information in the history of railroads that it is altogether improbable, and perhaps impossible, that all "lands, rights and franchises" (to use the language of the statute) which, in the progress of events, will be found to be necessary for the reasonable use and maintenance of a great railroad, can or would be acquired at the time when cars were first able to pass over the whole road. Constant and continued acquisition of lands for side-tracks, switches, depots, work-shops, warehouses, the relocation of the tracks, and for many other purposes, must be had. And as this apparently is to be done in the name and by the authority of this board of trustees, and no provision is made in the statute that it should be done by any other person or body, it is not lightly to be presumed or found by the court, searching for the intent of the legislature, as to the tenure of office of such board, that it was the purpose to prevent any such future acquisitions from the moment that the railway was sold or leased, even for the shortest period. The fact that the continuance of the board, so far as the performance of this duty was concerned, was expressly stipulated for by these lessees, who bind themselves by the lease to pay a certain sum annually for their expenses and services, is evidence of the understanding of all parties to the lease, and a recognition by them that the functions of the trustees did not cease with the execution of such contract of lease.

But we are not left to mere inference as to the intent of our general assembly as to this matter. Since the lease of this railroad, in 1881, several statutes have been enacted which, in our judgment, clearly recognize the fact that these trustees are not *functi officio*. On April 22, 1885 (sec. 8336-10, Rev. Stat.), they were expressly authorized to expend certain money in filling up and improving for the use of the railway so leased lands in the city of Cincinnati purchased by them for terminal facilities for such road. And on March 12, 1887 (sec. 8336-11), the mayor of the city and the president of said board of trustees were authorized in a certain event to execute, on behalf of the city, a deed for such railway, to be at-

tested also by the signature of the board and the seal thereof.   And still later, on
March 8, 1889 (sec. 8336-14), such board of trustees, with the approval of the
trustees of the sinking fund, was authorized on certain terms to extend the lease
of the road, for any length of time, and power was granted to do this within three
years from the passage of the law.

It seems manifest to us from these enactments that the legislature, which
has the right to continue the powers of these trustees, and to confer new and
other duties upon them, has recognized and affirmed the continued existence of
the board after the execution of the lease, and that it still had duties to discharge
with reference to this railway, and imposed new duties upon them.   And in addi-
tion to this, the act of March 8, 1889, in effect at least, continues them in exist-
ence until March 8, 1892, if the act authorized is not accomplished before that
time.   It is a general principle of law which should be borne in mind and con-
sidered, while seeking for the meaning of these statutes, as to whether the duties
and office or agency of these trustees still continues, that in the absence of defi-
nite statements in the instrument creating the trust to the contrary, or fixing its
duration, the trustee will be entitled to execute the same while a necessity that
he should do so exists.   We have expressed the opinion that such necessity ex-
ists here.   What is to become of the railway when the present lease expires?
Or if it should shortly be forfeited for failure on the part of the lessees to comply
with their contract?   Could it not again be leased or sold by the trustees with
the approval of the trustees of the sinking fund under existing legislation?   We
see no reason to doubt this, or to hold that, having once made a lease for a defi-
nite period, that the power conferred is exhausted and all of the functions of the
trustees have ceased.   Nor do we think the claim of the counsel for the city, that
if the functions of the trustees still continue, under the recent legislation to which
we have referred, such legislation is unconstitutional as being in conflict with the
provisions of sec. 20, of art. 2, is correct.   The supreme court, in the Walker case,
21 O. S., 50, expressly decided that the trustees, under the legislation as it then
stood, were not officers within the meaning of that clause of the constitution
which provides that "the general assembly, in cases not provided for in this con-
stitution, shall fix the term of office and the compensation of all officers," and that
said board was a mere agency which the general assembly might authorize muni-
cipal and other corporations to employ for local and temporary purposes."   We
see nothing in the laws on this subject passed after this decision which would
make them officers within the meaning of this provision of the constitution.   We,
therefore, hold that the board, under existing legislation, is still in existence, and
that the demand upon it for this arbitration was in accordance with the contract,
and need not have been made upon the city.

3.   It is also claimed by the counsel for the plaintiff that the court should
enjoin any further steps of the lessees and trustees of the railway, under the pro-
ceedings for arbitration which has thus been initiated, for the reason that neither
of the questions which the lessees apply to have arbitrated is one which the par-
ties to the lease have thereby bound themselves to so submit; and further, that
the lessees have no valid claim for damages against the trustees or the city (which
in the event of an award in favor of the lessees, would have to pay it), on account
of the non-expenditure of money for terminal facilities, and that the claim asserted
for damages on account of alleged false and fraudulent representations, made
prior to the execution of the lease, by the board of trustees and the city as to
the condition of the railway, to induce them to make such lease, is wholly with-
out foundation—that such allegations are untrue, and only asserted for the fraud-
ulent purpose of obtaining an award against the city without any foundation
therefor.

Clause 14 of the lease of the road, so far as it is necessary to quote it, reads
as follows:

"Clause 14.   It is further mutually covenanted and agreed by the parties hereto, that
all questions of difference arising between the parties hereto in relation to the construc-

tion of this agreement, or otherwise in reference to the rights of the parties under this lease, shall upon the written demand of either party, stating in such demand the question or questions claimed to be in dispute, be submitted to the arbitration of five disinterested arbitrators," etc.

And the demand for arbitration made by the lessees stated the questions claimed to be in dispute thus:

"First—Compensation to said railway for damages suffered, losses incurred and expenditures made by it by reason of the failure of the trustees of the Cincinnati Southern Railway Co., and the city of Cincinnati, to provide terminal facilities at Cincinnati, necessary and proper for the transaction of the business of said railway company, as lessees of the said Cincinnati Southern Railway.

"Second—Damages sustained, losses incurred, and expenditures made by said railway company by reason of misrepresentations claimed by it to be false and fraudulent, made by your board and said city, at and before the making of the lease aforesaid, touching the kind, quality, and condition of the roadbed, tracks, bridges, trestles and other structures of and belonging to said Cincinnati Southern Railway, claimed by this company to have been made for the purpose of inducing it to enter into said lease, and in reliance upon the truth whereof said lease was executed by said company."

On the points thus raised we may say, 1st: We are of the opinion that the claim of the lessees thus asserted, arising out of the alleged breach by the trustees and the city of the provisions of the lease for the expenditure of certain money, in the purchase of terminal facilities for the railway so leased, is fairly covered by the arbitration clause. By the lease the trustees stipulated that to the extent of the trust funds provided by law for that purpose, being the residue of the sum of a certain fund of $300,000, they would provide lands in the city of Cincinnati for such terminal facilities. It is conceded by the petition of the plaintiff, as we understand it, that $10,000 of this residue has not been so expended by the trustees, and no claim was made in the argument of the counsel for the city, or by any one, that under this clause 11 of the lease such trustees were not bound to expend the whole of such residue, whatever it might be, for the purpose specifically stated therein. But it was provided that, as between the parties to such lease, the trustees were to "be the sole judges of the location and extent of such lands and rights, and of the amount to be expended therefor"—that is, as we understand it, the right was given to them to say in what part of the city and what particular lands and rights should be acquired, and the amount to be paid for each parcel; and it cannot properly be so construed as to entitle the trustees to say that they need not use any part of such residue for that purpose when they had just agreed that they would expend the whole of it in that way. And if they have failed or refused to expend any part of the amount which they so bound themselves to expend, and the lessees have suffered any loss thereby, we see no reason why, under this clause 14, they may not properly demand an arbitration as to this matter, and have an award made in the manner therein provided for.

But, coupled with this, is a demand for such arbitration on another claim which they assert, that is, for damages sustained, losses incurred and expenditures made by them, by reason of false and fraudulent representations made as is claimed by the trustees and the city before the lease was executed, as to the condition of said railway. We are unable to see that this raises a question in relation "to the construction of this agreement or otherwise in reference to the rights of the parties under this lease," which questions only the parties have agreed to arbitrate. It does not call for the judgment or decision of the arbitrators to be chosen, as to the meaning of the lease or of any part of it. Nor does it call for such judgment in reference to the rights of either party under the lease. It may be true that if such right had been promptly asserted in a court of equity and full proof made of such false and fraudulent assertions which the other party had a right to, and did rely upon, such lease so procured, might have been avoided by the court, and the lessees, so far as it could be done, be restored to their original position. Or, if they chose for any reason to retain the property leased, it is possible that on proper proof being made in an action to recover damages for such

wrong, proper compensation might be made by the court. But in our judgment the right to such relief or damages arose not under any of the terms of the lease itself, but wholly outside thereof, and that the arbitrators, even if the facts necessary for recovery in an action at law or in equity were fully shown, could not, under the provisions of clause 14, render an award in favor of the lessees for any damages therefor.

If these conclusions be correct, what is the result? Does the fact that one of the subjects as to which arbitration is demanded cannot under clause 14 be properly submitted to the arbitrators, afford a good ground to a court of equity in an action brought for that purpose, to enjoin any arbitration under the present demand therefor? We think not. One of the questions to be submitted being proper, the fact that it also seeks arbitration as to one which does not come within the contract of submission, ought not to prevent the arbitration from proceeding as to the other.

The next question which arises is whether the court should enjoin the defendants from proceeding to arbitrate this second question. On this point we have heard able arguments, and many cases have been cited to us from courts of the highest authority. We do not deem it necessary to quote from or discuss them at length, but simply say that, in the opinion of the majority of the court the great weight of reason and of authority is, that such relief should not be granted—that an appeal to a court of equity to prevent an arbitration, which the parties in certain cases have stipulated for, on such grounds as are assigned here, is premature, and should be denied. Why should the court presume that the arbitrators, when chosen, will undertake to hear evidence and make an award on the merits of a claim, when the terms of the submission under which they proceed defines and points out the character of the questions which are to be adjudicated by them, and an inspection and construction of which contract would show that their award was asked as to a matter which the parties have not agreed to submit to them? There is plausibility in the suggestion that if it is clearly made to appear to the court that the claim is wholly unfounded, or not within the terms of the submission, that it may well intervene to prevent useless litigation and great cost to the party seeking such equitable relief, and in which proceeding, it may be by mistake or want of knowledge on the part of the arbitrators, he may have a large judgment or award against him. But we do not understand that these are grounds upon which a court of equity should intervene to prevent such proceeding. It certainly cannot be rightfully claimed that if an action be brought by one person against another in a court of law, that equity would interpose and enjoin it on the ground that the plaintiff in the action had no right to recover thereon, or that he had based his right to do so on a contract which, in fact, gave him no such right. The sufficient answer to such a claim would be that the law gave the right to the plaintiff to bring this action in the courts, and that the presumption must be that if the plaintiff has no claim the court will say so. It is true that there are some cases in which courts of equity will enjoin the prosecution of an action at law when by accident, fraud or otherwise, an equitable defense cannot be made thereto (which is not the case, however, under our system of practice), or when it would be against conscience that the case should proceed therein, or, in other cases, to prevent a multiplicity of suit or oppressive litigation; but in all such there must be the strongest reason for such course. And it seems that the same principle should apply to a case where, by a valid contract, parties have agreed to refer certain questions to arbitration, and one of the parties is pursuing such remedy. And especially should a court of equity refrain from the exercise of this extraordinary power to prevent an arbitration, in a case like this, when it is the clear law, and conceded to be so by the counsel for the lessees, that if the arbitrators should proceed to adjudicate matters not covered by the agreement of submission, an award on the merits thereof would be void, and on petition therefor would be so declared and be set aside by the court. A majority of

the court is, therefore, of the opinion that the relief sought should not be granted, and that the temporary restraining order heretofore granted should be dissolved.

SWING, J., concurring.

COX, J. (dissenting).

I agree with the majority of the court on two propositions: First, that the office of the trustees is still in existence, and held by the present trustees. Second, that the claim to arbitrate for damages arising from fraud in the original contract upon which the lease was based, does not come within the meaning of the clause for arbitration in the lease. But I dissent from it on two other particulars:

First—I am of the opinion that the claim of the lessees for compensation to said railway for damages suffered by losses incurred and expenditures made by it by reason of the failure of the trustees of the Cincinnati Southern Railway and the city of Cincinnati to provide terminal facilities at Cincinnati necessary and proper for the transaction of the business of said railway company as lessee of said Cincinnati Southern Railway, is not a proper subject for arbitration under the terms of the lease.

By clause 11 of the lease it was covenanted between the parties hereto "that the trustees would to the extent of their trust fund, provided by law for that purpose, being the residue of the sum of three hundred thousand dollars as provided in the act of the general assembly of the state of Ohio, passed April 9, 1880, provide lands in the city of Cincinnati for workshops, depots, and other terminal facilities and rights of way thereto. Provided, that said trustees of the Cincinnati Southern Railway shall, as between the parties hereto, be sole judges of the location and extent of such lands and rights and of the amount to be expended therefor."

The lease does not provide, as is claimed in the notice of arbitration that these terminal facilities to be furnished by the trustees shall "be necessary and proper for the transaction of the business of said railway company as lessee of said Cincinnati Southern Railroad." It only provides that to the extent of their trust fund, to-wit, the residue of three hundred thousand dollars, they shall provide "lands and other terminal facilities thereto." The location, extent, and amount to be expended therefor by the trustees, is not made by the terms of the lease a subject of arbitration, but it is expressly provided that the trustees shall be the sole judges of the location, extent of such lands and rights, and of the amount to be expended therefor.

Now, it is claimed by the trustees, and is not disputed, as I understand, that they have expended $290,000 in such terminal facilities at Cincinnati, leaving the sum of only $10,000 unexpended. They do not deny that they are to use that amount for that purpose. There is nothing, therefore, in regard to this to be arbitrated. And even if they disputed it, or the amount expended, or the propriety or place of expenditure or extent of it, arbitration is not the plan which the parties themselves have fixed to decide it. Of these the trustees are made the sole judges. And if by fraud or collusion, or by violation of their trust, this money is not properly appropriated and used, the lessees are remitted to such other remedy at law or in equity as may be appropriate.

Being then, in my opinion, nothing whatever to arbitrate, it would seem to me to be trifling with a great institution like the Southern railroad to bring the force which is proposed to arbitrate this question. By the terms of the arbitration, neither of the five arbitrators shall be taxpayers nor residents of the city of Cincinnati. The lessees have selected two, and called upon the trustees to select two others. The two which the lessees have selected are men of distinguished character and ability—ex-president Cleveland and Clarence Seward, of New York. And we understand that if this arbitration must go on, the trustees would select in all probability two gentlemen of as high character, and the whole $10,000 swallowed up in fees. As to what these arbitrators can decide when they come to act is well settled in our state in several adjudicated cases. One, first Disney Superior Court Reporter, 380, where it was held, and numerous authorities cited on the same proposition, that the arbitrators can only hear such evidence as is proper to be heard in the trial of a case in a superior court.

Second—Any claim barred by the statute of limitation cannot be regarded if opposition be made by the party sought to be charged. See Russell on Arbitration, 207; 1 McLel. & Y. 160; Morse on Arbitration, 137; 2 California, 195.

If, as I contend, neither of these matters are subjects for arbitration, I think the trustees should not be put to the great expense and trouble of going through a protracted hearing upon subjects which might probably be brought before the court afterward on exception to the award of the arbitrators, and be held as without any jurisdiction for them to determine. I am aware that there are many authorities of high character holding that arbitrators should not be enjoined from proceeding in an arbitration, but in my opinion this case is analogous to those where parties are enjoined from vexatious suits and the multiplicity of suits, and an injunction should issue.

Theo. Hortsman and J. J. Glidden, for the city.

E. A. Ferguson, for trustees of the Cincinnati Southern Ry.

Edward Colston, for lessee.